11-0316-cv
Caronia v. Philip Morris USA

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2011

(Argued:  March 1, 2012                                                    Decided:  May 1, 2013)

Docket No. 11-0316-cv

_____

MARCIA L. CARONIA, LINDA McAULEY, and ARLENE FELDMAN,

Plaintiffs-Appellants,

- v. -

PHILIP MORRIS USA, INC.,

Defendant-Appellee.

_____

Before:  KEARSE, LOHIER, and DRONEY, Circuit Judges.

Appeal from a judgment of the United States District Court for the Eastern District of New York, Carol Bagley Amon, Judge, dismissing plaintiffs' claims against cigarette manufacturer for negligence, strict liability, breach of warranty, and medical monitoring with respect to increased risk of cancer, see 2010 WL 520558; 2011 WL 338425.

AFFIRMED in part; CERTIFIED in part to the Court of Appeals for the State of New York.

VICTORIA E. PHILLIPS, New York, New York (Steven J. Phillips, Stanley J. Levy, Jerome H. Block, Amber R. Long, Lisa W. Davis, Levy Phillips & Konigsberg, New York, New York, on the brief), for Plaintiffs-Appellants.

SHEILA BIRNBAUM, New York, New York (John H. Beisner, Jessica D. Miller, Geoffrey M. Wyatt, Skadden, Arps, Slate, Meagher & Flom Washington, D.C.; Gary R. Long, John K. Sherk, III, Shook, Hardy & Bacon, Kansas City, Missouri; Tammy B. Webb, Shook, Hardy & Bacon, San Francisco, California, on the brief), for Defendant-Appellee.

KEARSE, Circuit Judge:

Plaintiffs Marcia L. Caronia, Linda McAuley, and Arlene Feldman appeal from a judgment of the United States District Court for the Eastern District of New York, Carol Bagley Amon, Judge, dismissing their tort claims alleging negligence, strict products liability, and breach of the Uniform Commercial Code ("UCC") implied warranty of merchantability in connection with the design, manufacture, and sale by defendant Philip Morris USA, Inc. ("Philip Morris"), of cigarettes that allegedly contain unnecessarily dangerous levels of carcinogens when smoked by humans, and their independent equitable claim seeking to require Philip Morris to fund a program of medical monitoring for longtime smokers of Marlboro cigarettes who have not been diagnosed with, but are at risk for, lung cancer. The district court granted Philip Morris's motions for summary judgment dismissing plaintiffs' negligence and strict liability claims on the ground that they were untimely, and dismissing the breach-of-implied-warranty claims on the grounds that plaintiffs' earliest such claims were untimely, see Caronia v. Philip Morris USA, Inc., No. 06-CV-224, 2010 WL 520558 (E.D.N.Y. Feb. 11, 2010) ("Caronia I"), and that the timely warranty claims were not supported by sufficient evidence of breach, see Caronia v. Philip Morris USA, Inc., No. 06-CV-224, 2011 WL 338425

(E.D.N.Y. Jan. 13, 2011) ("Caronia II"). Pursuant to Fed. R. Civ. P. 12(b)(6), the court granted Philip Morris's motion to dismiss plaintiffs' free-standing claim for medical monitoring of Marlboro smokers who lack symptoms of smoking-related disease, ruling that plaintiffs failed to state a claim on which relief can be granted because they could not sufficiently plead that their injuries--i.e., their increased risk of cancer from smoking Marlboro cigarettes--were proximately caused by Philip Morris's conduct. See Caronia II. On appeal, plaintiffs contend principally that their negligence and products liability claims are timely and that they adequately pleaded proximate cause in their claims for breach of implied warranty and in their independent claim for medical monitoring. For the reasons that follow, we affirm the dismissal of plaintiffs' negligence, strict liability, and breach-of-warranty claims; with respect to plaintiff's free-standing equitable claim for medical monitoring, we certify several questions, detailed in Part III below, to the Court of Appeals for the State of New York with respect to the existence of such a claim under New York State law, and, if such a claim is recognized, as to the elements and accrual of such a claim.

I. BACKGROUND ................................................ 5

    A. <u>Plaintiffs' Negligence, Strict Liability, and Warranty Claims</u> .... 5

    B. <u>The Relief Requested</u> .............................. 7

    C. <u>Philip Morris's First Motion for Summary Judgment</u> .... 8

        1. <u>The Strict Products Liability and Negligence Claims</u> ... 9

        2. <u>The Breach-of-Warranty Claims</u> ............... 12

    D. <u>Plaintiffs' Fourth Amended Complaint</u> .......... 13

II. DISMISSAL OF THE COMMON-LAW AND UCC CLAIMS .... 16

    A. <u>Untimeliness of the Negligence and Strict Liability Claims</u> ... 18

        1. <u>The Continuing Exposure Theory</u> ............ 21

        2. <u>The Newly-Available Relief Theory</u> ......... 24

    B. <u>Summary Dismissal of the Breach of Implied Warranty Claims</u> ... 27

III. MEDICAL MONITORING AS AN INDEPENDENT CLAIM .... 29

    A. <u>Decisions of New York State Courts</u> ........... 30

    B. <u>Decisions by Federal District Courts in New York</u> .... 33

    C. <u>Decisions by Other States' Highest Courts</u> ....... 36

    D. <u>Elements of an Independent Medica+l Monitoring Cause of Action</u> ... 48

    E. <u>Certification of Questions to the New York Court of Appeals</u> ... 52

CONCLUSION ................................................ 55

# I. BACKGROUND

Plaintiffs, who commenced this action on January 19, 2006, seeking to pursue it as a class action, are residents of New York State ("State") who, within the State, smoked Marlboro cigarettes--defined in plaintiffs' pleadings as the entire line of cigarettes manufactured and sold by Philip Morris under the "Marlboro" brand. The claims at issue on this appeal are those asserted in plaintiffs' Third Amended Complaint (or "3rd Am. Comp.") and Fourth Amended Complaint (or "4th Am. Comp.") (collectively the "Complaints").

## A. Plaintiffs' Negligence, Strict Liability, and Warranty Claims

Plaintiffs are persons age 50 years or older who currently smoke Marlboro cigarettes, or ceased smoking them within one year prior to the commencement of this lawsuit, and smoked Marlboro cigarettes for at least 20 pack-years. (See 4th Am. Comp. ¶¶ 22-27; 3rd Am. Comp. ¶¶ 23-28.) A "pack[-]year" is defined in the Complaints as "the number of packs of cigarettes smoked per day multiplied by the number of years," e.g., one pack of cigarettes per day for one year equals one pack-year, and two packs per day equal two pack-years. (4th Am. Comp. ¶ 26, n.2; 3rd Am. Comp. ¶ 27, n.2.) "None of the plaintiffs is presently diagnosed with lung cancer" (4th Am. Comp. ¶ 28; 3rd Am. Comp. ¶ 29) "or under investigation by a physician for suspected lung cancer" (Complaints ¶ 1(e).) Plaintiffs contend, however, that lung cancer is the leading cause of cancer deaths in the United States and is responsible for the deaths of 160,000 Americans annually (see id. ¶ 4); that more than 80 percent of those deaths result from cigarette smoke (see id. ¶ 5); and that plaintiffs "are at significantly increased risk for developing lung cancer as a consequence of their use of Marlboro

cigarettes . . . specifically as a consequence of the excess quantities of carcinogens delivered by Marlboro cigarettes" (4th Am. Comp. ¶ 29; 3rd Am. Comp. ¶ 30).

The Complaints alleged that, during the relevant time period, Marlboro cigarettes regularly delivered between 6 and 17 milligrams of tar (see Complaints ¶ 53), a substance that "contains carcinogens which cause lung cancer" (id. ¶ 47), despite the existence of feasible alternatives for the manufacture of cigarettes delivering one milligram of tar or less (see id. ¶ 61). The Complaints alleged that Philip Morris had the ability to employ "feasible alternative designs which would have drastically reduced the cancer causing content of Marlboro cigarettes" (id. ¶ 18), such as by switching to a tobacco blend that would reduce or eliminate the quantity of "Burley" tobacco--known to contain high levels of cancer-causing nitrosamines--used in Philip Morris cigarettes (id. ¶¶ 64-67).

The Complaints also alleged that although smokers had been found by independent agencies to have a tendency to "compensate" for lower tar and nicotine levels in "light" cigarettes by taking "deeper, more intense" puffs (Complaints ¶ 56; see id. ¶ 57), Philip Morris had the technological ability to use a filter that would thwart such tendencies and deliver low overall levels of carcinogens simply by increasing its cigarettes' "'resistance to draw'" (id. ¶ 60; see id. ¶¶ 61-64). Philip Morris nonetheless allegedly chose to market Marlboro "Light" cigarettes that were "intentionally designed to permit full compensation" (id. ¶ 60; see also id. ¶¶ 58-59), allowing smokers of Marlboro Light cigarettes to inhale "approximately the same amount of tar as delivered by regular Marlboro 'Full Flavor' cigarettes" (id. ¶ 59).

In sum, the Complaints alleged that although Philip Morris knew at all relevant times that it was feasible to lower the carcinogenic content of its cigarettes (see, e.g., Complaints ¶¶ 62-65), it "purposely designed all of its Marlboro cigarettes to deliver an excessive amount of carcinogens

when smoked by humans" (id. ¶ 54; see also id. ¶¶ 63, 65-66).

Plaintiffs alleged that as a result of Philip Morris's voluntary, negligent, reckless, and/or intentional design of Marlboro cigarettes to deliver excessive amounts of carcinogens (see, e.g., 3rd Am. Comp. ¶¶ 86, 94), when it knew or should have known that such cigarettes caused lung cancer or increased the risk of lung cancer and thus were defective products not reasonably safe for their intended use (see id. ¶¶ 84-85), plaintiffs and members of the proposed class--"composed of at least tens of thousands of persons" (Complaints ¶ 35)--were placed at significantly increased risk of developing lung cancer (see 4th Am. Comp. ¶ 29; 3rd Am. Comp. ¶ 30). Plaintiffs contended that Philip Morris was (a) strictly liable for distributing its defective products (see 3rd Am. Comp. ¶¶ 80-90); (b) liable for negligence in failing to properly design, test, and inspect Marlboro cigarettes, thereby violating its "legal duty to create a reasonably 'safer' cigarette which delivered substantially less carcinogens when smoked by a human" (3rd Am. Comp. ¶ 93; see id. ¶¶ 92-99); and (c) liable for breach of the UCC implied warranty of merchantability, as Marlboro cigarettes were not safe for the ordinary purposes intended by Philip Morris and used by Marlboro smokers (see 4th Am. Comp. ¶¶ 105-107; 3rd Am. Comp. ¶¶ 101, 112-113).

B. The Relief Requested

As relief for their claims of negligence, strict liability, and breach of warranty, plaintiffs stated that they did not seek compensatory or punitive damages but instead sought to have Philip Morris provide funding for a court-supervised program of medical monitoring for class members who are at increased risk of lung cancer from smoking Marlboro cigarettes (see, e.g., 3rd Am. Comp. ¶ 19).

Plaintiffs alleged that when lung cancer is diagnosed at an early stage, it is usually

curable. (See Complaints ¶ 6.) But, they alleged, conventional forms of medical surveillance such as chest x-rays and sputum cytology are poor tools for identifying lung cancer at an early stage (see id. ¶ 9); hence, in the past, by the time the cancer was diagnosable, prospects for cure were usually dim (see id. ¶ 7). The Complaints alleged that a recently established (see id. ¶ 10) medical surveillance technique known as Low Dose CT Scanning of the chest ("'LDCT'"), "is a safe, efficacious and inexpensive technique, which, for the first time, provides a means to identify and diagnose lung cancers at an early stage, when they are still curable" (id. ¶ 3). LDCT can identify and lead to the diagnosis of Stage I lung cancers that previously would have remained undiagnosed until the cancer had reached an advanced, and likely incurable, stage. (See id. ¶ 10.) LDCT screening is currently unavailable as a benefit in most, if not all, private or public health insurance programs (see id. ¶ 15); the cost of LDCT is "a modest annual expense [of ]less than five hundred ($500) dollars per patient per year[]" and involves "a lower dose of radiation than is associated with an annual mammogram" (3rd Am. Comp. ¶ 11).

C. Philip Morris's First Motion for Summary Judgment

After plaintiffs had filed their Third Amended Complaint and discovery had been completed, Philip Morris moved for summary judgment dismissing the action on statute-of-limitations and/or causation grounds. Plaintiffs opposed the motion and cross-moved for certification of their proposed class. The district court in Caronia I granted Philip Morris's motion to the extent of dismissing as untimely the negligence and strict liability claims in their entirety and the breach-of-warranty claims in part. The court denied Philip Morris's motion to the extent that the motion sought dismissal of the breach-of-warranty claims based on lack of evidence of proximate causation, and it

reserved decision on the motion for class certification.

### 1. The Strict Products Liability and Negligence Claims

Philip Morris contended that plaintiffs' strict liability and negligence claims were essentially claims for damages and thus were barred by the three-year limitations period provided by New York Civil Practice Law & Rules ("CPLR") § 214-c(2), which applies to, inter alia, "an action to recover damages for personal injury . . . caused by the latent effects of exposure to any substance or combination of substances, in any form." Plaintiffs argued, inter alia, that their claims were not for damages but for equitable relief, and that the applicable statute of limitations was thus the six-year period provided by CPLR § 213(1), which generally applies to actions seeking equitable relief, including injunctive relief, see, e.g., 2004 Commentary CPLR 213(1), or to actions for which no limitations period is specified.

The district court, noting that "[b]oth parties agree that the injury in this action is the increased risk of developing lung cancer as a result of smoking Marlboro cigarettes for twenty pack-years," concluded that plaintiffs' strict liability and negligence claims were untimely "under either statute." Caronia I, 2010 WL 520558, at *3. Under § 214-c(2), assuming that plaintiffs' claims were properly characterized as claims for damages, the statute of limitations would have begun "to run upon the 'date of discovery' of the injury," Caronia I, 2010 WL 520558, at *3, i.e., the dates on which plaintiffs discovered that smoking Marlboro cigarettes increased their risk of lung cancer. The court noted that the record revealed that each of the plaintiffs was over the age of 50 when this suit was commenced in 2006, see id. at *1; that each had begun smoking as a teenager, see id.; that it was "undisputed that each of the named plaintiffs in this action reached twenty pack-years of smoking by

– 9 –

the mid 1990s," Feldman by 1992, McAuley by approximately 1980, and Caronia by, at the latest, 1996, see id. at *5; and that the deposition "testimony of each plaintiff establishe[d her] awareness of an increased risk of cancer well before January 19, 2003," id. at *3; see also id. at *6 n.10 ("Plaintiffs do not, and cannot, argue that they did not know smoking cigarettes was the cause of their increased risk of lung cancer."). Accordingly, the court concluded that if the three-year limitations period of § 214-c(2) applied, plaintiffs' strict liability and negligence claims were time-barred.

The district court also rejected plaintiffs' contention that those claims would be timely under CPLR § 213(1)'s six-year limitations period, i.e., that their claims accrued on or after January 19, 2000. The court pointed out that unlike the three-year statute of limitations provided in § 214-c(2), "the six-year statute of limitations under 213(1) begins to run" not on the date the injury is discovered but on the date the cause of action accrues, to wit, "'when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court,'" Caronia I, 2010 WL 520558, at *3 (quoting Aetna Life & Casualty Co. v. Nelson, 67 N.Y.2d 169, 175, 501 N.Y.S.2d 313, 316 (1986)), "'i.e., when all elements of the tort can be truthfully alleged in a complaint,'" Caronia I, 2010 WL 520558, at *3 (quoting Snyder v. Town Insulation, Inc., 81 N.Y.2d 429, 432-33, 599 N.Y.S.2d 515, 516-17 (1993)).

The court described the elements of claims for strict liability and negligence. A plaintiff asserting a claim of strict liability must be able to show that she was injured, that the defendant produced a product that was not "'reasonably safe'" for its intended use, and that the product's "'defect was the proximate cause of the injury.'" Caronia I, 2010 WL 520558, at *4 (quoting Voss v. Black & Decker Manufacturing Co., 59 N.Y.2d 102, 107, 109, 463 N.Y.S.2d 398, 402, 403 (1983)). A plaintiff asserting a negligence claim must be able to show that "the defendant owed the

plaintiff a cognizable duty of care," that "the defendant failed to exercise that duty," and that "the plaintiff suffered injury as a proximate result of that failure." Caronia I, 2010 WL 520558, at *4; see, e.g., Akins v. Glen Falls City School District, 53 N.Y.2d 325, 333, 441 N.Y.S.2d 644, 648 (1981); Becker v. Schwartz, 46 N.Y.2d 401, 410, 413 N.Y.S.2d 895, 899 (1978).

In light of plaintiffs' assertions that their injuries consisted of being subjected to increased risk of lung cancer by reason of having smoked Marlboro cigarettes for at least 20 pack-years, and given that it was undisputed that each plaintiff had reached 20 pack-years of smoking Marlboro cigarettes by the mid-1990s, the court reasoned that plaintiffs could have truthfully alleged all of the elements of their claims for strict liability and negligence by then. It concluded that those claims thus accrued "well outside of the six-year statute of limitations available under 213(1)," Caronia I, 2010 WL 520558, at *5.

The district court rejected plaintiffs' contentions that their strict liability and negligence claims were timely under § 213(1) either (a) on the theory that such claims accrue anew with each newly injurious exposure, or (b) because the remedy they sought--medical monitoring via LDCT scanning--had only become an available and accepted screening tool for lung cancer within a year prior to the commencement of this action. The court found the former theory untenable because it had been rejected by the New York Court of Appeals in Snyder v. Town Insulation, Inc., 81 N.Y.2d at 433-35, 599 N.Y.S.2d at 517-18. The court rejected plaintiffs' newly-available-remedy theory of timeliness on the ground that, "as is readily apparent from a review of the elements of both causes of action, neither claim is dependent upon the availability of a specific remedy," and therefore the availability of LDCT as a remedy "is irrelevant to the accrual" of those claims. Caronia I, 2010 WL 520558, at *4.

## 2. The Breach-of-Warranty Claims

Plaintiffs did not dispute that their breach-of-warranty claims were governed by the four-year statute of limitations set out in N.Y. U.C.C. § 2-725 and were timely only to the extent that they arose from purchases of Marlboro cigarettes on or after January 19, 2002. See Caronia I, 2010 WL 520558, at *6. Philip Morris sought summary judgment dismissing the timely warranty claims on the ground that, even assuming that Marlboro cigarettes bought on or after January 19, 2002, were not reasonably fit for their intended purpose, plaintiffs could not establish that those cigarettes were the proximate cause of their injuries because they faced an increased risk of lung cancer well before January 19, 2002. The district court denied this motion, finding that plaintiffs had adduced evidence that the smoking of Marlboro cigarettes after that date would have further increased the risk of lung cancer, and that "[i]n light of such evidence, summary judgment is not warranted on causation grounds." See id. at *7.

The court stated, however, that Philip Morris had raised an additional challenge to plaintiffs' warranty claims to which plaintiffs had not had an appropriate opportunity to respond. The court invited supplementary briefing as to that challenge, to wit, Philip Morris's contention that the claims for breach of the implied warranty of merchantability of Marlboro cigarettes purchased after January 19, 2002, were barred by plaintiffs' knowledge of the risks and dangers of tobacco use, or the common knowledge of smoking-related health effects, together with the warnings on all packs of cigarettes. See id. at *8.

D.  Plaintiffs' Fourth Amended Complaint

The district court noted that plaintiffs had sought medical monitoring as a remedy for their tort claims of strict liability, negligence, and breach of warranty but had not sought to plead a free-standing equitable claim for medical monitoring, and neither side had briefed the precise issue of whether New York recognizes such a cause of action.  See Caronia I, 2010 WL 520558, at *8-*9. The court concluded that plaintiffs should be allowed to file a further amended complaint in the interests of justice.

In their Fourth Amended Complaint, plaintiffs repeated virtually all of the factual allegations of the Third Amended Complaint and added a new "EQUITABLE CAUSE OF ACTION" for medical monitoring.  Plaintiffs reiterated their assertions that Philip Morris had "designed, produced, manufactured, and sold cigarettes, which, even if used properly, substantially and unnecessarily elevated Plaintiffs' and the class members' likelihood of developing lung cancer" (4th Am. Comp. ¶ 110), that plaintiffs' injuries cannot be remedied by an award of money damages (see id. ¶ 115), and that there exists a medical test for early detection having the potential for altering the course of the disease, but it is available only through a program of medical monitoring (id.).  Plaintiffs added that Philip Morris,

> motivated by extreme greed, and a reckless and depraved disregard of the virtual certainty that the sale of its addictive and deadly products would condemn hundreds of thousands of its customers to awful disease and lingering deaths, . . . set out to sell its defective and deadly products to children and others.  For instance, Plaintiffs in this case commenced smoking at the ages of fifteen (Caronia), sixteen (Feldman) and approximately fifteen or sixteen (McCauley [sic]).

> 112.  To the extent that there is not a legal remedy available to Plaintiffs, Defendant's egregious conduct and its devastating consequences impose a duty on the Court under New York Law to fashion an appropriate

equitable remedy to redress the grave effects of Philip Morris'[s] misconduct.

> 113. The programmatic medical monitoring through LDCT sought by Plaintiffs in the instant action is a remedy appropriately tailored to both the nature of Philip Morris' misconduct, and the injuries that it has inflicted on the class members.

(4th Am. Comp. ¶¶ 111-113.) Plaintiffs also renewed their motion for class certification.

Philip Morris moved under Fed. R. Civ. P. 12(b)(6) to dismiss this independent cause of action for failure to state a claim, arguing that New York would not recognize such a claim. It argued that even if the State would approve of ordering medical monitoring as a remedy, it would do so only as a remedy for an existing tort. The district court rejected these contentions.

The district court explored cases decided by New York courts and other courts, see Caronia II, 2011 WL 338425, at *5-*6, and predicted

> that the New York Court of Appeals would recognize an independent claim for medical monitoring, and . . . further predict[ed] that the Court of Appeals would conclude that the statute of limitations for such a claim begins to run on the first date that some medical monitoring program is accepted within the medical community as an effective method of lung cancer screening or surveillance.

Caronia II, 2011 WL 338425, at *3. The court also hypothesized that to establish such a claim a plaintiff would be required to plead the following elements:

> (1) exposure at greater than background levels; (2) to a proven hazardous substance; (3) caused by defendant's tortious conduct; (4) as a proximate result of the exposure, plaintiff faces an elevated risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes early detection possible; (6) the monitoring program is different than the program normally prescribed in the absence of exposure; and (7) the monitoring program is reasonably necessary according to contemporary scientific principles.

Id. at *7.

However, the court concluded that plaintiffs' medical monitoring claim must be

dismissed for failure "to plead that Philip Morris's allegedly tortious conduct is the reason that they must now secure a monitoring program that includes LDCT scans." Id. at *3. It stated that

> the plaintiffs must plead and prove that Philip Morris's failure to produce and market a non-defective cigarette is the reason that the plaintiffs must now secure medical monitoring that includes LDCT scans. This pleading requirement is most obviously embodied by element (6) of the monitoring claim, which requires that the plaintiffs plead and prove that the medical monitoring they now require is different f[ro]m the monitoring that physicians would prescribe for individuals who have not been tortiously exposed to defective Marlboro cigarettes.

Id. at *10. The court concluded that plaintiffs failed to meet this pleading requirement

> because the fourth amended complaint contains no allegation that, if Philip Morris had conformed its conduct to the law and designed and marketed a reduced tar cigarette, the plaintiffs would not require the same medical monitoring that they are seeking in this suit. Nowhere have the plaintiffs pleaded that if Philip Morris had marketed and designed the non-defective cigarette they describe, they would not have been exposed to harmful levels of tar.

Id. at *11. The court thus granted Philip Morris's Rule 12(b)(6) motion to dismiss the stand-alone medical monitoring claim.

Philip Morris also moved for summary judgment dismissing the breach-of-warranty claims that had survived its first summary judgment motion, pressing the contention, as the district court described it, that a "product need only provide 'for a minimal level of quality' and meet 'the expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manner,'" Caronia II, 2011 WL 338425, at *12 (quoting Denny v. Ford Motor Co., 87 N.Y.2d 248, 258-59, 639 N.Y.S.2d 250, 256 (1995)), and "that under this 'consumer expectations' test, the plaintiffs cannot prove breach of implied warranty because everyone knew, at the time that the Marlboros at issue in this litigation were sold, that cigarettes, when used normally, put people at risk

of developing lung cancer," Caronia II, 2011 WL 338425, at *12. The court found this argument persuasive:

> The plaintiffs do not contend that, in the years relevant to this complaint, consumers, including the plaintiffs, thought that smoking tobacco was generally safe and did not expose them to a significantly elevated risk of developing cancer. (See Def. Ex. F.) Rather, they argue, consumers did not know that Philip Morris could easily have produced a safer cigarette. (Pl. R. 56.1 ¶ ¶ 11, 32.) As clarified by counsel at oral argument, the plaintiffs' contention is that consumers generally did not know that Marlboro cigarettes were defective (i.e. unnecessarily dangerous), not that they did not know that they were dangerous, indeed very dangerous. This contention fails because it conflates what New York considers two distinct theories of liability and improperly inserts risk-utility considerations into the law of warranty. See Denny, 87 N.Y.2d at 258, 639 N.Y.S.2d 250, 662 N.E.2d 730 ("It is this negligence-like risk/benefit component of the defect element that differentiates strict products liability claims from UCC[-]based breach of implied warranty claims in cases involving design defects.") . . . . Indeed, the Court believes that the plaintiffs concede this point about conflation when they argue that they "are not required by law to prove the existence of a feasible alternative design in order to prevail at trial on a warranty theory." (Pl. S.J. Opp. at 8.)
>
> Because the plaintiffs concede their knowledge of the dangers of cigarettes, and the Court thinks it irrelevant whether the plaintiffs thought their cigarettes could not be any safer, the Court rejects the argument that Marlboros contained an implied warranty that Philip Morris breached.

Caronia II, 2011 WL 338425, at *12-*13.

Judgment was entered dismissing the action in its entirety and denying plaintiffs' motion for class certification as moot.

## II. DISMISSAL OF THE COMMON-LAW AND UCC CLAIMS

Plaintiffs contend that the district court erred in granting summary judgment dismissing their claims for negligence, strict products liability, and breach of the implied warranty of

merchantability, arguing principally (1) that their negligence and strict liability claims are timely under CPLR § 213(1) either because the limitations period began anew with each harmful exposure to Marlboro cigarettes or because plaintiffs could not assert those claims until the LDCT remedy they request became available, and (2) that their breach-of-warranty claims could not properly be dismissed as a matter of law because there were genuine issues to be tried as to whether Marlboro cigarettes could have been made safer for their intended purpose.

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether that standard is met, the court must draw all reasonable factual inferences in favor of the party against whom summary judgment is sought. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Lyons v. Lancer Insurance Co., 681 F.3d 50, 56 (2d Cir. 2012). The same standard governs our review of the granting of summary judgment. See, e.g., Kaytor v. Electric Boat Corp., 609 F.3d 537, 546 (2d Cir. 2010); Petrosino v. Bell Atlantic, 385 F.3d 210, 219 (2d Cir. 2004); Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61 (2d Cir. 1998). We "will construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant," Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); we review the "district court's interpretation of law . . . de novo," id.

Applying these standards--and applying principles of New York law, which governs this case in which federal jurisdiction is premised on diversity of citizenship--we conclude that summary judgment dismissing plaintiffs' negligence, strict liability, and breach of warranty claims was appropriate.

A.  Untimeliness of the Negligence and Strict Liability Claims

Under New York law, in order to recover on a claim for negligence, a plaintiff must show "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." Akins v. Glens Falls City School District, 53 N.Y.2d 325, 333, 441 N.Y.S.2d 644, 648 (1981). "In order to establish a prima facie case in strict products liability for design defects, the plaintiff must show that the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury." Voss v. Black & Decker Manufacturing Co., 59 N.Y.2d 102, 107, 463 N.Y.S.2d 398, 402 (1983); see id. at 109, 463 N.Y.S.2d at 403 ("the plaintiff is required to show that the defectively designed product caused his injury and that the defect was the proximate cause of the injury"). Plainly, to recover on either type of claim, a plaintiff must prove injury.

Preliminarily, we note that plaintiffs, despite having argued before the district court that the six-year limitations period provided in CPLR § 213(1) applied, appear to argue on appeal that their negligence and strict liability claims are not subject to any statute of limitations. They point out that the three-year limitations period provided in CPLR §§ 214(5) and 214-c(2) apply, respectively, to actions to recover damages for personal injury and to actions seeking damages for latent injuries caused by exposure to toxic substances (Plaintiffs' brief on appeal at 24); they state, inter alia, that "Plaintiffs do not allege personal injury in this case" (id. (emphasis added)); and they state that "[i]f a provision of the CPLR applied to [plaintiffs'] claims, it would be the six-year catch all provision of N.Y. C.P.L.R. § 213(1) (Plaintiffs' brief on appeal at 25 (emphasis added)).

Although the absence of an allegation of injury in a tort claim could indeed pose a

conundrum for identifying the commencement of the limitations period, see, e.g., Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 934 (1993) ("as a general proposition, a tort cause of action cannot accrue until an injury is sustained"); Ackerman v. Price Waterhouse, 84 N.Y.2d 535, 541, 620 N.Y.S.2d 318, 321 (1994) ("it is upon injury that a legal right to relief arises in a tort action and the Statute of Limitations begins to run . . . .") (emphasis added), the inquiry would likely not reach the affirmative defense stage, for if the complaint failed to allege injury, it would be dismissable for failure to state a claim.

Here, however, plaintiffs had alleged that each plaintiff--and each member of the proposed class--had smoked a minimum of 146,000 Marlboro cigarettes and as a result had been "exposed to an excessive amount of carcinogens" (Third Amended Complaint ¶ 68); that the negligence, design defects, and other misconduct attributed to Philip Morris in its manufacture and sale of those cigarettes "caus[ed] plaintiffs to be at increased risk of developing lung cancer" (e.g., id. ¶¶ 90, 99, 113); and that "Plaintiffs and the Class have suffered . . . harm as a result of defendants' [sic] wrongful conduct" (id. ¶ 38). At oral argument of Philip Morris's first summary judgment motion, the district court sought and received explicit clarification that plaintiffs were claiming injury in the form of their increased risk of developing lung cancer:

> "THE COURT: So the elements of your claim are that it was defectively designed and that defective design was the proximate cause of an injury, that injury being an increased risk of getting lung cancer.

> Mr. BLOCK [counsel for plaintiffs]: That's absolutely right, your Honor."

Caronia I, 2010 WL 520558, at *5 (quoting Transcript of oral argument of summary judgment motion, February 7, 2008, at 51) (emphases ours). Accordingly, we see no error in the district court's

conclusion that "[b]oth parties agree[d] that the injury in this action is the increased risk of developing lung cancer as a result of smoking Marlboro cigarettes for twenty pack-years," id. at *3 (emphasis added).

While plaintiffs contend that their claims are timely under the six-year limitations period and that the three-year limitations period provided in CPLR § 214(5) is inapplicable because it governs actions to recover "damages," whereas they are seeking a remedy of medical monitoring rather than damages (Plaintiffs' brief on appeal at 24), Philip Morris argues that plaintiffs' claims are untimely even under the six-year limitations period. However, Philip Morris contends that those claims are subject to the three-year limitations period because in reality the request for medical monitoring is a request for "'consequential damages'" (Philip Morris brief on appeal at 17 n.6) (quoting Askey v. Occidental Chemical Corp., 102 A.D.2d 130, 135, 477 N.Y.S.2d 242, 247 (4th Dep't 1984) ("Askey")).

We, like the district court, need not resolve the question of whether the applicable statute of limitations is three years or six years. Although the choice between limitations periods may depend on whether the relief sought by the plaintiff is legal or equitable, see, e.g., Loengard v. Santa Fe Industries, Inc., 70 N.Y.2d 262, 266, 519 N.Y.S.2d 801, 803 (1987), the district court properly concluded that plaintiffs' claims are time-barred under either statute.

In challenging the district court's ruling that their negligence and strict liability claims were untimely because the injury they alleged--the increased risk of lung cancer resulting from 20 pack-years of smoking Marlboro cigarettes--arose in the mid-1990s, plaintiffs renew their arguments (a) that Philip Morris's continuing course of conduct in manufacturing and selling Marlboro cigarettes "inflict[ed] new and continuing injury, or aggravate[d] old injury," thereby causing the limitations

period to begin anew with each new exposure (Plaintiffs' brief on appeal at 29-30), and (b) that their claims did not accrue until approximately one year before they commenced this action, when the relief they sought--LDCT--became available (see id. at 27-28). Both contentions are contrary to New York law.

### 1. The Continuing Exposure Theory

New York's CPLR provides that "except as otherwise expressly prescribed," limitations periods "shall be computed from the time the cause of action accrued." CPLR § 203(a) (McKinney 2003). A cause of action has accrued "when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court." Aetna Life and Casualty Co. v. Nelson, 67 N.Y.2d 169, 175, 501 N.Y.S.2d 313, 316 (1986).

In Snyder v. Town Insulation, Inc., 81 N.Y.2d 429, 599 N.Y.S.2d 515 (1993) ("Snyder"), the New York Court of Appeals considered the question of when a cause of action accrued for "damages for [respiratory] injuries [that the plaintiffs] allegedly sustained as a result of emissions from ureaformaldehyde foam insulation installed in their home in 1977." Id. at 431, 599 N.Y.S.2d at 515. As the lawsuit sought damages (and the date-of-discovery rule was not at issue, see id., 599 N.Y.S.2d at 516), the three-year limitations period provided by CPLR § 214 applied; however, the claim was first asserted more than five years after the plaintiffs had begun inhaling the injurious emissions. Resolution of the timeliness question turned on "whether accrual under CPLR 214 is measured from the date of injury or from the date of last exposure." Id., 599 N.Y.S.2d at 516 (emphasis added). The court concluded that the claim was barred because it had accrued on the date of injury:

> An action to recover damages for personal injuries must be commenced within three years from the date of accrual (CPLR 203 [a]; 214 [5]; but see, 214-c). As a general proposition, the cause of action does not accrue until an injury is sustained . . . . Stated another way, accrual occurs when the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint . . . . The straightforward application of these principles leads to the conclusion that plaintiffs' causes of action accrued on the date they were first injured. At that moment, all elements of the tort could be truthfully alleged, and they had a colorable claim against defendants.

81 N.Y.2d at 432-33, 599 N.Y.S.2d at 516-17 (emphases added).

The court rejected the Snyders' contention that the New York Court of Appeals had, "in so-called 'toxic tort' cases, where the injury results from injection, ingestion, or inhalation of a substance," established a date-of-last-exposure rule. 81 N.Y.2d at 433, 599 N.Y.S.2d at 517. The court stated that no Court of Appeals case stood for such a rule. It noted, for example, that in a case in which a worker had "commenced a negligence action against his employer, alleging that inhalation of dust on the job resulted in lung disease several years later," and had argued that the accrual of his cause of action should be "the date of the onset of the disease," the New York Court of Appeals had "rejected that proposition and restated the traditional rule: 'There can be no doubt that a cause of action accrues only when the forces wrongfully put in motion produce injury,'" 81 N.Y.2d at 433, 599 N.Y.S.2d at 517 (quoting Schmidt v. Merchants Despatch Transportation Co., 270 N.Y. 287, 300-01, 200 N.E. 824, 827 (1936)). The Snyder court noted that the lung disease was not the injury: "Disease [i]s a consequence of the injury, . . . not the injury itself, and the injury was complete at the moment the dust was inhaled even though plaintiff may not have been aware of it then . . . ." 81 N.Y.2d at 433, 599 N.Y.S.2d at 517.

Thus, the New York Court of Appeals in Snyder observed that "[f]or more than a half a century, our cases have uniformly held that such causes of action accrue upon injury." Id.; see, e.g.,

Rothstein v. Tennessee Gas Pipeline Co., 87 N.Y.2d 90, 93, 637 N.Y.S.2d 674, 675 (1995) ("The long-standing rule in toxic tort cases in New York has been that when chemical compounds are injected into a person's body, the injury occurs upon the drugs['] introduction, not when the alleged deleterious effects of its component chemicals become apparent.") (internal quotation marks omitted).

The Snyder Court pointed out that "[d]etermining when limitations begin to run requires a balancing of policy considerations." 81 N.Y.2d at 435, 599 N.Y.S.2d at 518.

> On one side of the scale are the interests of injured parties. Unquestionably, a Statute of Limitations can have a severe impact on their rights when, for instance, an injury is not discovered until years later. The Legislature has acted to ameliorate the rule in such cases in recent years (see, CPLR 214-c). Conversely, defendants are entitled to a fair opportunity to defend claims against them before their ability to do so has deteriorated . . . .

Id. The court thus rejected the contention of Mrs. Snyder that her suit was timely because she was still living in the house and was continuing to suffer exposure to the insulation. The court declined to adopt a rule that would give "a plaintiff . . . the power to put off the running of the Statute of Limitations indefinitely." Id. Cf. Adamo v. Brown & Williamson Tobacco Corp., 11 N.Y.3d 545, 551, 872 N.Y.S.2d 415, 418 (2008) (stating, on an issue other than accrual, that "[t]o hold . . . that every sale of regular cigarettes exposes the manufacturer to tort liability would amount to a judicial ban on the product").

We conclude that the district court in the present case correctly interpreted Snyder as establishing that a claim for injury caused by harmful exposure to toxic substances accrues when that exposure occurs, and does not, as plaintiffs in the present case argue, repeatedly accrue with each new inhalation. As this action was commenced in 2006, and plaintiffs' depositions established that plaintiffs had known more than three years earlier that smoking cigarettes was the cause of their

increased risk of lung cancer, and that each plaintiff had reached the 20-pack-year level by the mid-1990s at the latest, the district court properly ruled that their injuries occurred prior to the applicable limitations period, whether that period was three years or six.

## 2. The Newly-Available Relief Theory

Notwithstanding the occurrence of the injury of "increased risk of developing lung cancer" (Third Amended Complaint ¶¶ 90, 99, 113) more than six years prior to their 2006 commencement of this action, plaintiffs contend that their claims did not accrue until 2006, because "prior to the instant suit's commencement, no efficacious relief," i.e., LDCT, "was available" (Plaintiffs' brief on appeal at 28). Thus, plaintiffs contend that a cause of action does not accrue until a form of relief that an injured person prefers has become technologically feasible.

In support of this contention, plaintiffs quote snippets from a number of cases; but none of them stands for such a proposition. For example, plaintiffs cite LaBello v. Albany Medical Center Hospital, 85 N.Y.2d 701, 706, 628 N.Y.S.2d 40, 42 (1995), for its statement that "the '[s]tatute of Limitations does not run until there is a legal right to relief' and 'accrual occurs when the claim becomes enforceable'" (Plaintiffs' brief on appeal at 26). That case, however, involved a claim for prenatal injury, and the court simply ruled that the claim did not accrue until the child was born. See 85 N.Y.2d at 708, 628 N.Y.S.2d at 44. In Aetna Life & Casualty Co. v. Nelson, 67 N.Y.2d 169, 175, 501 N.Y.S.2d 313, 316 (1986), cited for its statement that "'[t]he Statute of Limitations begins to run . . . when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court'" (Plaintiffs' brief on appeal at 26), the court merely held that where an insurer has paid its insured for a loss and the insured recovers compensation for that loss from

another source, the insurer's right to recoup "any [such] recovery obtained by the insured" does not accrue until that recovery has in fact been obtained, 67 N.Y.2d at 176, 501 N.Y.S.2d at 317 (internal quotation marks omitted). In Jacobus v. Colgate, 217 N.Y. 235, 245, 111 N.E. 837, 840 (1916), cited for its statement that "'[a] cause of action does not accrue until its enforcement becomes possible'" (Plaintiffs' brief on appeal at 29), the court was discussing the fact that until 1913 no New York court had jurisdiction to entertain a suit for injury to real property that was outside of the State, see 217 N.Y. at 239, 111 N.E. at 838. In Vigilant Insurance Co. v. Housing Authority of the City of El Paso, 87 N.Y.2d 36, 43, 637 N.Y.S.2d 342, 346 (1995), cited for its statement that a claim cannot accrue until "'all of the facts necessary to sustain the cause of action have occurred, so that a party could obtain relief in court'" (Plaintiffs' brief on appeal at 25), the court was discussing the unremarkable principle that the "right to sue on [a] bond's principal debt does not accrue until the debt is 'due and payable,'" 87 N.Y.2d at 44, 637 N.Y.S.2d at 346.

Plaintiffs recognize, however, that more than two decades prior to the commencement of this action it was "clear that New York's courts look with favor on claims for medical monitoring" (Plaintiffs' brief on appeal at 35-36 (citing, inter alia, Askey, 102 A.D.2d at 135, 477 N.Y.S.2d at 246)), and on medical monitoring requests by plaintiffs who had been exposed to carcinogenic substances and feared they would develop cancer (Plaintiffs' brief on appeal at 36 (citing, inter alia, Dangler v. Town of Whitestown, 241 A.D.2d 290, 294, 672 N.Y.S.2d 188, 190 (4th Dep't 1998) ("Dangler"), and Abusio v. Consolidated Edison Co., 238 A.D.2d 454, 454, 656 N.Y.S.2d 371, 372 (2d Dep't 1997) ("Abusio")).

In Abusio, although the court upheld the dismissal of cancerphobia claims on the ground that the plaintiffs had not presented sufficient evidence to prevail, it noted, citing cases, the

availability of actions for recovery of the cost of future medical monitoring as relief for cancerphobia:

> Under the prevailing case law, in order to maintain a cause of action for fear of developing cancer or for future medical monitoring costs following exposure to a toxic substance like polychlorinated biphenyls (hereinafter PCBs), a plaintiff must establish both that he or she was in fact exposed to the disease-causing agent and that there is a "rational basis" for his or her fear of contracting the disease . . . . This "rational basis" has been construed to mean the clinically demonstrable presence of PCBs in the plaintiff's body, or some indication of PCB-induced disease, i.e., some physical manifestation of PCB contamination . . . .

238 A.D.2d at 454-55, 656 N.Y.S.2d at 372 (emphasis added).

In Dangler, the appellate court reversed the dismissal of cancerphobia claims that were based on effluvium emanating from a contaminated landfill, and stated:

> It is well settled that, to maintain a cause of action for cancerphobia, "[a] plaintiff must establish both that he was in fact exposed to the disease-causing agent and that there is a 'rational basis' for his fear of contracting the disease" . . . . "[W]hen the circumstances of the case provide a guarantee of the genuineness of the claim", a plaintiff may recover for negligent infliction of purely mental suffering . . . .

241 A.D.2d at 293, 672 N.Y.S.2d at 190. The Dangler court stated that the trial court had "erred in striking the testimony of plaintiffs' experts regarding . . . future medical monitoring." Id. at 294, 672 N.Y.S.2d at 190 (citing Askey, 102 A.D.2d at 135, 477 N.Y.S.2d at 246).

The Dangler court also, in discussing assumption of risk, noted that "smoking" involves "voluntary exposure to carcinogens," 241 A.D.2d at 294, 672 N.Y.S.2d at 191 (emphasis added), an observation confirming that the dangers of smoking were common knowledge. And the court in Inzerilla v. American Tobacco Co., No. 11754/96, 2000 WL 34016364 (N.Y. Sup. Ct. Oct. 27, 2000), noted that "[t]he carcinogenic danger from cigarettes was common knowledge from at least 1969." Id. at *14.

It is clear, from Askey and its progeny, that plaintiffs in the present action, by the time their injuries arose in or before the mid-1990s, could have brought suit to seek relief in the New York courts. Plaintiffs have not called to our attention any case--nor are we aware of any--holding that a cause of action for injury that is cognizable in the New York courts does not accrue until a remedy that the injured person would prefer becomes available.

We conclude that the district court properly dismissed plaintiffs' claims for negligence and strict products liability as barred by the applicable statute of limitations.

B. Summary Dismissal of the Breach of Implied Warranty Claims

Plaintiffs contend that the district court erred in dismissing their claims for breach of the UCC implied warranty of merchantability, arguing that they raised a genuine issue of fact to be tried as to whether Marlboro cigarettes could have been made safer for their intended purpose. The district court granted summary judgment dismissing these claims on the ground that, because the dangers of cigarette smoking were well known long before plaintiffs reached the 20-pack-year mark in or before the mid-1990s, plaintiffs could not have relied on any warranty that Marlboro cigarettes were safe. Plaintiffs concede that they "had knowledge that Marlboros were dangerous and carcinogenic," but they assert that "[w]hat [they] did not know, and what Philip Morris concealed from them, was that [Marlboro cigarettes] were unnecessarily carcinogenic by orders of magnitude." (Plaintiffs' brief on appeal at 40 (emphasis added).) Citing an expert report that they submitted in opposition to summary judgment, "describ[ing] in detail a multitude of ways in which Marlboro cigarettes could have been designed to reduce the product's excessive carcinogenicity" (id. at 41), plaintiffs argue that "[a] defendant who sells a product that is unnecessarily and covertly dangerous

-27-

will be liable for breach of implied warranty despite the consuming public's or plaintiff's general knowledge of the product's dangers" (id. at 39). We are unpersuaded that the district court erred.

"The implied warranty of merchantability is a guarantee by the seller that its goods are fit for the intended purpose for which they are used and that they will pass in the trade without objection." Saratoga Spa & Bath, Inc. v. Beeche Systems Corp., 230 A.D.2d 326, 330, 656 N.Y.S.2d 787, 789 (3d Dep't 1997). Under New York state's version of the UCC, this guarantee is "implied in a contract for . . . sale if the seller is a merchant," N.Y. U.C.C. § 2-314(1)--that is, if the seller, inter alia, "deals in" the type of goods sold, id. § 2-104(1). A merchant breaches the UCC implied warranty of merchantability if it sells goods that are not "fit for the ordinary purposes for which such goods are used," N.Y. U.C.C. § 2-314(2)(c). This standard does not require that the goods be perfect, see Saratoga Spa & Bath, Inc. v. Beech Systems Corp., 230 A.D.2d at 330, 656 N.Y.S.2d at 790, or that they "fulfill [a] buyer's every expectation," Denny v. Ford Motor Co., 87 N.Y.2d 248, 258 n.4, 639 N.Y.S.2d 250, 256 n.4 (1995) ("Denny") (internal quotation marks omitted); it requires only that the goods sold be of "a minimal level of quality," id. (internal quotation marks omitted). The inquiry

> focuses on the expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manners. The cause of action is one involving true "strict" liability, since recovery may be had upon a showing that the product was not minimally safe for its expected purpose-- without regard to the feasibility of alternative designs or the manufacturer's "reasonableness" in marketing it in that unsafe condition.

Denny, 87 N.Y.2d at 258-59, 639 N.Y.S.2d at 256 (emphases added).

As the Denny quote indicates, the New York Court of Appeals has taken care to distinguish this merchantability-related strict liability from the liability that is more typically associated with claims for defective products. The strict products liability cause of action "originates

in tort law, which traditionally has concerned itself with social policy and risk allocation," whereas the breach of implied warranty cause of action "originates in contract law, which directs its attention to the purchaser's disappointed expectations." Id. at 259, 639 N.Y.S.2d at 256. As a result, "the core element of 'defect' is subtly different in the two causes of action." Id. at 256, 639 N.Y.S.2d at 255. In products liability cases, the New York courts will inquire whether, "if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." Id. at 257, 639 N.Y.S.2d at 255 (internal quotation marks omitted). By contrast, "the UCC's concept of a 'defective' product requires an inquiry only into whether the product in question was fit for the ordinary purposes for which such goods are used." Id. at 258, 639 N.Y.S.2d at 256 (internal quotation marks omitted). Products liability's "negligence-like risk/utility approach is foreign to the realm of contract law." Id. at 262, 639 N.Y.S.2d at 258.

The issue of fact raised by plaintiffs as to whether Philip Morris could have made Marlboro cigarettes safer, therefore, is not an issue that is material to the claim of breach of implied warranty of merchantability. That implied warranty is not breached if the cigarettes were minimally safe when used in the customary, usual, and reasonably foreseeable manner. We conclude that summary judgment dismissing these claims was appropriate.

### III. MEDICAL MONITORING AS AN INDEPENDENT CLAIM

The question of whether a plaintiff may maintain an independent cause of action for medical monitoring under New York law has not been addressed by the New York Court of Appeals.

And although the matter has been dealt with in New York's intermediate appellate courts, in the federal district courts in New York, and in the highest courts of several other states, the treatments have varied.

A.  Decisions of New York State Courts

In 1984, the Appellate Division in Askey, dealing with claims of exposure to toxic discharges from a landfill, considered whether the plaintiffs could recover for anticipated needs for medical monitoring.  The procedural question before that court was whether the plaintiffs' motion for class action certification had been properly denied; an underlying substantive question concerned the cognizability of claims for damages or injunctive relief by those plaintiffs who had not yet exhibited physical injury:

> The novel issue presented is whether those persons who have an increased risk of cancer, genetic damage and other illnesses by reason of their exposure to the toxic chemicals emanating from the landfill, but whose physical injuries are not evident, should be certified as a class for the purpose of determining their right to recover the costs of future medical monitoring services to diagnose warning signs of the development of disease.

102 A.D.2d at 131, 477 N.Y.S.2d at 244.  The court noted that one group of plaintiffs was solely

> concerned with injuries which have not surfaced but which may afflict them in the future.  They allege that their exposure has increased their risk of developing cancer and other chemically induced diseases, and in their complaint seek as a remedy the imposition of a constructive trust upon the property owned by defendants in an amount sufficient to pay for the cost of medical detection services made necessary by the increased hazards, reserving the right to seek damages for such enhanced risks.

Id. at 133, 477 N.Y.S.2d at 245.  The court stated that "damages resulting from the enhanced risk of cancer and the threat of future harm not yet realized are not compensable in a tort action."  Id. at 135,

477 N.Y.S.2d at 246 (emphasis added). However, the court concluded that recovery "for medical monitoring" was available "as an element of <u>consequential</u> damage." <u>Id</u>. (emphasis added).

> [A] plaintiff has a cause of action immediately upon exposure to a foreign substance and can recover all damages which he can show resulted or would result therefrom, even though at the time the action is commenced no serious damage to the plaintiff has developed. The theory of liability grows out of the invasion of the body by the foreign substance, with the assumption being that the substance acts immediately upon the body setting in motion the forces which eventually result in disease . . . . The defendant is liable for "reasonably anticipated" consequential damages which may flow later from that invasion although the invasion itself is an injury too slight to be noticed at the time it is inflicted.

<u>Id</u>. at 136, 477 N.Y.S.2d at 247 (other internal quotation marks omitted).

The court went on to note that

> [t]he proof problems are, of course, formidable. In order to recover for apprehended consequences not presently manifest, there must be such a degree of probability of their occurrence as to amount to a reasonable certainty that they will result . . . . Damages for the prospective consequences of a tortious injury are recoverable only if the prospective consequences may with reasonable probability be expected to flow from the past harm. Consequences which are contingent, speculative, or merely possible are not properly considered in ascertaining damages . . . . If a plaintiff seeks future medical expenses as an element of consequential damage, he must establish with a degree of reasonable medical certainty through expert testimony that such expenses will be incurred . . . .

<u>Id</u>. at 136-37, 477 N.Y.S.2d at 247.

While the <u>Askey</u> court ultimately ruled that there were a number of individualized issues that warranted upholding the denial of class certification, it concluded that the record sufficed to indicate that the

> <u>persons exposed to toxic chemicals emanating from the landfill have an increased risk of invisible genetic damage and a present cause of action for their injury, and may recover all "reasonably anticipated" consequential damages</u>. The future expense of medical monitoring could be a recoverable

consequential damage provided that plaintiffs can establish with a reasonable degree of medical certainty that such expenditures are "reasonably anticipated" to be incurred by reason of their exposure. There is no doubt that such a remedy would permit the early detection and treatment of maladies and that as a matter of public policy the tort-feasor should bear its cost.

Id. at 137, 477 N.Y.S.2d at 247 (emphasis added).

Although Askey also opined that the statute of limitations had begun to run from the date of the plaintiffs' last exposure to the toxic substances, a view that, as discussed in Part II.A.1. above, was subsequently rejected by the New York Court of Appeals in Snyder, Snyder did not purport to deal with Askey's views of the availability of damages or of equitable relief in the form of medical monitoring. Nor are we aware of any other New York Court of Appeals case that has addressed this issue.

Following Askey, New York intermediate appellate courts and trial-level courts have continued to rule that plaintiffs who have been tortiously exposed to toxic substances and can show that they have a rational basis for their fear of developing cancer may be allowed to recover the cost of medical monitoring as an element of reasonably anticipated consequential damages. See, e.g., Osarczuk v. Associated Universities, Inc., 36 A.D.3d 872, 877, 830 N.Y.S.2d 711, 715 (2d Dep't 2007) (holding "medical monitoring and other injunctive relief" available as remedies for claims of negligence and gross negligence in causing exposure to hazardous non-nuclear chemicals and substances).

As indicated in Part II.A.2. above, the "'rational basis'" element means there must be a "clinically demonstrable presence of [the toxic substance] in the plaintiff's body, or some indication of [toxin]-induced disease, i.e., some physical manifestation of [toxic] contamination." Abusio, 238 A.D.2d at 455, 656 N.Y.S.2d at 372 (upholding dismissal of claims for future cost of medical

monitoring for cancer "[b]ecause the appellants failed to show a 'rational basis' for their fear of developing the disease"); see, e.g., Allen v. General Electric Co., 32 A.D.3d 1163, 1164-65, 821 N.Y.S.2d 692, 693-95 (4th Dep't 2006) ("Allen") (overturning a judgment that dismissed medical monitoring claims by plaintiffs who "were exposed to the toxins but exhibit no present illness or injury as a result of that exposure"); Dangler, 241 A.D.2d at 294, 672 N.Y.S.2d at 190 (finding that, as to claims of cancerphobia resulting from exposure to toxic emissions from landfill, trial court erred in excluding evidence as to plaintiffs' need for medical monitoring and in not submitting that issue to the jury); Gerardi v. Nuclear Utility Services, Inc., 149 Misc.2d 657, 657-59, 566 N.Y.S.2d 1002, 1003-04 (Sup. Ct. West. Co. 1991) ("Gerardi") (although stating that "damages resulting from the enhanced risk of disease and the threat of future harm not yet realized are not compensable in a tort action," ruling that "plaintiffs have stated a cause of action for both reasonably anticipated consequential damages, to include future medical expenses for lifetime medical monitoring and diagnostic treatment as a result of the negligence of defendants in causing, or suffering to be caused, exposure of plaintiffs to toxic asbestos contamination and for negligent infliction of emotional distress").

B. Decisions by Federal District Courts in New York

In addition, most of the federal district courts sitting in New York State have ruled that medical monitoring is available as a remedy for tortious exposure to carcinogenic substances even if the plaintiffs have not exhibited symptoms of cancer, concluding that the New York Court of Appeals would recognize such a claim. In Gibbs v. E.I. DuPont de Nemours & Co., 876 F. Supp. 475 (W.D.N.Y. 1995) ("Gibbs"), the plaintiffs alleged that their job duties exposed them to chemical compounds that were defective and unreasonably dangerous when used in a foreseeable manner; they

complained that exposure to those substances subjected them to an excessive risk of developing bladder cancer. See id. at 476. The plaintiffs had not been diagnosed with bladder cancer and sought "injunctive relief in the form of a court-administered fund paid for by defendants which would cover the reasonably anticipated costs of a medical monitoring program for bladder cancer for the lifetime of the class members." Id. at 477. The defendants moved to dismiss on the ground, inter alia, that New York State does not recognize a cause of action for medical monitoring damages in the absence of present physical injury. Relying on Askey and on two decisions of the federal court of appeals for the Third Circuit in In re Paoli R.R. Yard PCB Litigation, 916 F.2d 829 (3d Cir. 1990) ("Paoli I"), and 35 F.3d 717 (3d Cir. 1994) ("Paoli II"), the district court rejected defendants' argument, stating as follows:

> Although the New York courts have not conclusively ruled on the availability of a claim for medical monitoring in the absence of present injury, I believe that Askey accurately represents a growing national acceptance of a such a claim . . . and would be embraced by the New York Court of Appeals. Thus, the medical monitoring claim shall stand.

Gibbs, 876 F. Supp. at 479; see also Paoli I, 916 F.2d at 850 ("[t]he injury in a medical monitoring claim is the cost"). The Gibbs court also concluded that the request for a "court-administered fund which goes beyond payment of the costs of monitoring an individual plaintiff's health to establish pooled resources for the early detection and advances in treatment of the disease" is a request for relief that "is injunctive in nature rather than 'predominantly [for] money damages.'" Id. at 481.

The district court in Abbatiello v. Monsanto Co., 522 F.Supp.2d 524, 536 (S.D.N.Y. 2007) ("Abbatiello"), similarly rejected a defense contention that medical monitoring claims are not cognizable under New York law.

> "Medical monitoring is one of a growing number of non-traditional

torts that have developed in the common law to compensate plaintiffs who have been exposed to various toxic substances." In re Paoli R.R. Yard PCB Liti[g]., 916 F.2d 829, 849 (3d Cir. 1990) . . . . The injuries caused by exposure to toxic substances may take years to manifest themselves physically, and during this latency period, plaintiffs are burdened with the expense of regular medical testing. This medical monitoring is intended to detect the onset of latent injuries or diseases and to facilitate early diagnosis and treatment. However, plaintiffs may be unable to recover under traditional tort law, which generally requires a presently existing physical injury. Recognizing this difficulty, a number of states have allowed plaintiffs to bring claims for the costs of periodic medical monitoring.

Abbatiello, 522 F.Supp.2d at 536. Though noting that there was not uniformity in the views of other states or the federal district courts, the Abbatiello court, citing principally Askey, Allen, Abusio, Gerardi, and Gibbs, see, e.g., Abbatiello, 522 F.Supp.2d at 537-39, concluded that "in cases involving exposure to toxic materials, the New York Court of Appeals would recognize an independent cause of action for medical monitoring" even "where the present damage is not a physical injury but the financial burden associated with periodic medical monitoring," id. at 538. As to the elements of such a cause of action, the court predicted that the New York Court of Appeals would require proof of

(1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's tortious conduct; (4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

Id. at 539; see, e.g., Sorrentino v. ASN Roosevelt Center, 579 F.Supp.2d 387, 390 (E.D.N.Y. 2008) (concluding that the intermediate appellate courts had "expressly recognized an independent cause of action for medical monitoring," citing Dangler, Abusio, and Allen, and denying motion to dismiss claims for exposure to mold where tenants other than the plaintiffs had "developed exposure-related

health conditions"); Swearingen v. Long, 889 F. Supp. 587, 590 (N.D.N.Y. 1995) (denying motion to amend complaint with respect to a claim for medical monitoring where the proffer fell "far short of the standards articulated in Askey").

See also Beckley v. United States, No. 92 Civ. 8137, 1995 WL 590658, at *4 (S.D.N.Y. 1995) ("In New York, courts recognize a separate cause of action, with a relaxed standard of proof, for medical monitoring expenses due to exposure to toxic chemicals when the plaintiff cannot show with reasonable certainty that he will contract a disease as a result of the exposure."); but see In re World Trade Center Disaster Site, No. 21-MC-100, 2006 WL 3627760, at *1, *3 (S.D.N.Y. Dec. 12, 2006) (in actions for, inter alia, respiratory "injuries suffered by workers performing the clean-up functions at the World Trade Center site and nearby locations in the aftermath of the terrorist-related aircraft crashes," requests for relief in the form of "medical monitoring" ordered stricken from the complaints on the ground that although "such relief may perhaps be considered as [an] equitable remed[y], if causes of action are otherwise proved and if the remedies are held to be appropriate and in accordance with the law," "[t]hey do not constitute independent causes of action").

C.  Decisions by Other States' Highest Courts

Courts in other states considering whether claims for medical monitoring are cognizable under their respective state laws have reached varying results.  Some have recognized an independent cause of action for medical monitoring; most of those courts have laid out the elements of such a claim, see Part III.D. below.  Other courts have treated medical monitoring as a remedy for a traditional tort claim in which the risk of disease is considered the injury; and others have refused to recognize any tort claim where there is no claim of present injury.

In a case paralleling the present action, Donovan v. Philip Morris USA, Inc., 455 Mass. 215, 914 N.E.2d 891 (2009) ("Donovan"), the plaintiffs were smokers who had reached the age of 50 years or older, had smoked Marlboro cigarettes within the Commonwealth of Massachusetts, and had smoked for at least 20 pack-years. They had "not [been] diagnosed with lung cancer" and were not "under investigation by a physician for suspected lung cancer." Id. at 216-17, 914 N.E.2d at 895. "The sole remedy" they sought was a court-supervised "medical surveillance program that utilizes a specific technology, LDCT screening, which will advise them, at an early stage, whether they have developed lung cancer." Id. at 219, 914 N.E.2d at 287. Answering two questions certified to it by a federal district court with respect to injuries that are "subclinical," i.e., denoting the presence of a disease without manifest symptoms, the Massachusetts Supreme Judicial Court held (1) that "the plaintiffs' suit for medical monitoring, based on subclinical effects of exposure to cigarette smoke and increased risk of lung cancer, state[s] a cognizable claim and/or permit[s] a remedy under Massachusetts state law," id. at 215-16, 221, 914 N.E.2d at 894, 898, and (2) such a claim will be considered timely asserted if, prior to an otherwise applicable limitations period, there was "absolutely no remedy" available, id. at 229, 914 N.E.2d at 904.

The Donovan court rejected the defense contention that medical monitoring could not be ordered without a showing by the plaintiffs of "physical harm manifested by objective symptomology," id. at 224, 914 N.E.2d at 901.

> Modern living has exposed people to a variety of toxic substances. Illness and disease from exposure to these substances are often latent, not manifesting themselves for years or even decades after the exposure. Some people so exposed may never develop an illness or disease, but some will. Subcellular or other physiological changes may occur which, in themselves, are not symptoms of any illness or disease, but are warning signs to a trained physician that the patient has developed a condition that indicates a substantial

increase in risk of contracting a serious illness or disease and thus the patient will require periodic monitoring. Not all cases will involve physiological change manifesting a known illness, but such cases should be allowed to proceed when a plaintiff's reasonable medical expenses have increased (or are likely to increase, in the exercise of due care) as a result of these physiological changes. We leave for another day consideration of cases that involve exposure to levels of chemicals or radiation <u>known</u> to cause cancer, for which immediate medical monitoring may be medically necessary although no symptoms or subclinical changes have occurred. Here, the physiological changes with the attendant substantial increase in risk of cancer, and the medical necessity of monitoring with its attendant cost, may adequately establish the elements of injury and damages.

Our tort law developed in the late Nineteenth and early Twentieth centuries, when the vast majority of tortious injuries were caused by blunt trauma and mechanical forces. We must adapt to the growing recognition that exposure to toxic substances and radiation may cause substantial injury which should be compensable even if the full effects are not immediately apparent. See <u>Hansen v. Mountain Fuel Supply Co.</u>, 858 P.2d 970, 977 (Utah 1993). When competent medical testimony establishes that medical monitoring is necessary to detect the potential onset of a serious illness or disease due to physiological changes indicating a substantial increase in risk of harm from exposure to a known hazardous substance, the element of injury and damage will have been satisfied and the cost of that monitoring is recoverable in tort. No particular level or quantification of increase in risk of harm is necessary, so long as it is substantial and so long as there has been at least a corresponding subcellular change. <u>Id</u>. at 979-980. This should address any concern over false claims, . . . yet permit a genuinely injured person to recover legitimate expenses without having to overcome insurmountable problems of proof in this difficult and complex area. In this respect, medical expenses are recoverable not only for direct treatment and diagnosis of a present injury or an injury likely to occur, but for diagnostic tests needed to monitor medically a person who has been substantially exposed to a toxic substance that has created physiological changes indicating a substantial increase in risk that the person will contract a serious illness or disease. The expense of medical monitoring is thus a form of future medical expense and should be treated as such.

<u>Donovan</u>, 455 Mass. at 225-26, 914 N.E.2d at 901 (emphasis in original).

In setting out the elements of such an independent claim for medical monitoring, <u>see</u>

Part III.D. below, the <u>Donovan</u> court stated that there must exist an "effective medical test for reliable

early detection" of the disease. 455 Mass. at 226, 914 N.E.2d at 902. Thus, the court rejected the defense contention that the cause of action accrued when the plaintiffs discovered their increased risk of cancer, and accepted the plaintiffs' contention that their cause of action for medical monitoring could not accrue until such a test existed.

> In this case, it is not merely the risk of cancer of which the plaintiffs have notice, but the substantial increase in the risk of cancer, as reflected in their complaint. Because the harm involves subclinical changes that only will be discovered by a physician, notice most likely will take the form of advice by a physician, together with a recommendation for diagnostic testing conformably with the medical standard of care. In short, the statute begins to run when (1) there is a physiological change resulting in a substantial increase in the risk of cancer, and (2) that increase, under the standard of care, triggers the need for available diagnostic testing that has been accepted in the medical community as an efficacious method of lung cancer screening or surveillance.

> As previously discussed, medical monitoring expense is the plaintiffs' only arguably provable damages. They could not have sued for pain and suffering or lost earning capacity. This is not a case where plaintiffs recovered damages for pain and suffering, lost earning capacity, but only some medical expenses based on existing medical technology. These plaintiffs, or so they allege, had absolutely no remedy until LDCT technology appeared. If they can establish these circumstances, which are unusual and perhaps unique to medical monitoring claims, then their claims are timely. This is a question that cannot be resolved on the record before us; it must be resolved on a motion for summary judgment or, if genuine issues of material fact remain, by a jury. The plaintiffs also must show that the standard of care of the reasonable physician did not call for monitoring of any precancerous condition prior to the statute of limitations period, not just that the technology at that time was less effective for monitoring.

Id. at 228-29, 914 N.E.2d at 903-04 (emphases added).

In dealing with claims of exposure to hazardous substances other than by smoking, other states too have recognized independent causes of action for medical monitoring in the absence of evident physical injury. In Ayers v. Township of Jackson, New Jersey, 106 N.J. 557, 565, 525 A.2d 287, 290 (1987) ("Ayers"), the court dealt with claims by plaintiffs who had ingested water from their

wells, which had been contaminated by toxic pollutants leaching into an aquifer from the defendant's landfill. The plaintiffs did not seek recovery for specific illnesses; rather, they requested "the expenses of annual medical examinations to monitor their physical health and detect symptoms of disease at the earliest possible opportunity." 106 N.J. at 577, 525 A.2d 297. A jury award to the plaintiffs of some $8.2 million for medical monitoring expenses had been set aside by the intermediate appellate court as too speculative to warrant recognition under the state's tort claims act. The New Jersey Supreme Court reinstated that award. See id. at 606-07, 525 A.2d at 313.

Quoting Askey's statement that the cost of prescribed medical monitoring is recoverable as consequential damages, see id. at 603, 525 A.2d at 311, the Ayers court also noted that

> [c]ompensation for reasonable and necessary medical expenses is consistent with well-accepted legal principles. See C. McCormick, Handbook on the Law of Damages § 90 at 323-27 (1935). It is also consistent with the important public health interest in fostering access to medical testing for individuals whose exposure to toxic chemicals creates an enhanced risk of disease. The value of early diagnosis and treatment for cancer patients is well-documented.

Ayers, 106 N.J. at 603-04, 525 A.2d at 311. The court stated:

> Harm in the form of increased risk of future cancer attributable to delay in diagnosis and treatment has become so widely accepted by the medical community that the existence of such harm could be reasonably inferred from this professional common knowledge. A survey of the medical literature indicates that it is universally agreed within the medical community that delay in cancer diagnosis and treatment usually increases the risk of metastasis.

106 N.J. at 604, 525 A.2d at 311 (internal quotation marks omitted). The court concluded that

> [a]n application of tort law that allows post-injury, pre-symptom recovery in toxic tort litigation for reasonable medical surveillance costs is manifestly consistent with the public interest in early detection and treatment of disease.

Id.

In Hansen v. Mountain Fuel Supply Co., 858 P.2d 970, 972 (Utah 1993) ("Hansen"), the court vacated a lower court's summary dismissal of medical monitoring for persons whose work had exposed them to asbestos but who did not currently suffer from any asbestos-related disease. The court stated in part as follows:

> Allowing recovery for such expenses avoids the potential injustice of forcing an economically disadvantaged person to pay for expensive diagnostic examinations necessitated by another's negligence. Indeed, in many cases a person will not be able to afford such tests, and refusing to allow medical monitoring damages would in effect deny him or her access to potentially life-saving treatment. It also affords toxic-tort victims, for whom other sorts of recovery may prove difficult, immediate compensation for medical monitoring needed as a result of exposure. Additionally, it furthers the deterrent function of the tort system by compelling those who expose others to toxic substances to minimize risks and costs of exposure. . . . Allowing such recovery is also in harmony with "the important public health interest in fostering access to medical testing for individuals whose exposure to toxic chemicals creates an enhanced risk of disease."

858 P.2d at 976-77 (quoting Ayers, 106 N.J. at 603, 525 A.2d at 311) (footnote omitted).

In Potter v. Firestone Tire & Rubber Co., 6 Cal.4th 965, 863 P.2d 795 (1993) ("Potter"), the court ruled that "medical monitoring costs[] . . . are a compensable item of damages in a negligence action where the proofs demonstrate, through reliable medical expert testimony, that the need for future monitoring is a reasonably certain consequence of the plaintiff's toxic exposure and that the recommended monitoring is reasonable." Id. at 974, 863 P.2d at 555-56. The court stated that

> recovery of medical monitoring costs is supported by a number of sound public policy considerations. First, there is an important public health interest in fostering access to medical testing for individuals whose exposure to toxic chemicals creates an enhanced risk of disease, particularly in light of the value of early diagnosis and treatment for many cancer patients. (Ayers, supra, 525 A.2d at p. 311 . . . .) Second, there is a deterrence value in recognizing medical surveillance claims--"[a]llowing plaintiffs to recover the cost of this care deters irresponsible discharge of toxic chemicals by defendants. . . ." (In re Paoli, supra, 916 F.2d at p. 852; . . . Ayers, supra, 525 A.2d at pp. 311-312; cf.

*Friends For All Children*[, Inc. v. Lockheed Aircraft Corp.], 746 F.2d [816,] 825[ (D.C. Cir. 1984)].) Third, "[t]he availability of a substantial remedy before the consequences of the plaintiffs' exposure are manifest may also have the beneficial effect of preventing or mitigating serious future illnesses and thus reduce the overall costs to the responsible parties." (*Ayers*, *supra*, 525 A.2d at p. 312 . . . .) In this regard, the early detection of cancer may improve the prospects for cure, treatment, prolongation of life and minimization of pain and disability. Finally, societal notions of fairness and elemental justice are better served by allowing recovery of medical monitoring costs. That is, it would be inequitable for an individual wrongfully exposed to dangerous toxins, but unable to prove that cancer or disease is likely, to have to pay the expense of medical monitoring when such intervention is clearly reasonable and necessary. (*Ayers*, *supra*, 525 A.2d at p. 312 . . . .)

*Potter*, 6 Cal.4th at 1008, 863 P.2d at 824. The *Potter* court

emphasiz[ed] that allowing compensation for medical monitoring costs "does not require courts to speculate about the probability of future injury. It merely requires courts to ascertain the probability that the far less costly remedy of medical supervision is appropriate." (*In re Paoli*, *supra*, 916 F.2d at p. 852.) Indeed, [s]cience may well counsel medical intervention with respect to a known health risk long before it reaches the point where the law would regard its occurrence as reasonably certain. . . . We are therefore persuaded that recovery of medical monitoring damages should not be dependent upon a showing that a particular cancer or disease is reasonably certain to occur in the future.

*Potter*, 6 Cal.4th at 1107-08, 863 P.2d at 824 (other internal quotation marks omitted). The court concluded that "[r]ecognition that a defendant's conduct has created the need for future medical monitoring does not create a new tort"; such monitoring "is simply a compensable item of damage" that "may be called for as a result of a defendant's tortious conduct, even in the absence of actual physical injury." *Id*. at 1007, 863 P.2d at 823.

Accord *Meyer v. Fluor Corp.*, 220 S.W.3d 712, 717 (Mo. 2007) ("medical monitoring costs are recoverable because compensation for necessary medical expenses reasonably certain to be incurred in the future rests on well-accepted legal principles" of Missouri law that "provide that a

plaintiff is entitled to recover for the prospective consequences of the defendant's tortious conduct if the injury is reasonably certain to occur"); see id. at 718 ("Even though a plaintiff may not have yet developed a diagnosable physical injury, it is not accurate to conclude that no compensable injury has been sustained."); id. (declining to impose a physical-injury requirement as "inconsistent with the reality of latent injury and with the fact that the purpose of medical monitoring is to facilitate the early diagnosis and treatment of latent injuries caused by exposure to toxins"); Bower v. Westinghouse Electric Corp., 206 W.Va. 133, 138, 141, 522 S.E.2d 424, 429, 432 (1999) (ruling that "under West Virginia law, a plaintiff who does not allege a present physical injury can assert a claim for the recovery of future medical monitoring costs where such damages are the proximate result of defendant's tortious conduct"); Redland Soccer Club, Inc. v. Department of the Army, 548 Pa. 178, 194-95, 696 A.2d 137, 145 (1997) ("Redland") (citing Ayers and Hansen, and approving a court-supervised fund for medical monitoring of plaintiffs who did not allege actual injury from exposure to hazardous substances disposed of in a landfill); Day v. NLO, Inc., 144 F.R.D. 330, 336 (S.D. Ohio 1992) ("In the case at bar, the defendants allegedly caused all of the potential class members to be overexposed to radioactive materials through negligent or intentional misconduct. If the plaintiffs in this case ultimately prove their allegations, the class members will be entitled to injunctive relief in the form of an extensive court-supervised medical monitoring program."); Cook v. Rockwell International Corp., 778 F. Supp. 512, 514 (D. Colo. 1991) (predicting that "the Colorado Supreme Court would probably recognize, in an appropriate case, a tort claim for medical monitoring" (internal quotation marks omitted)).

Other courts have rejected the proposition that a plaintiff may recover medical monitoring costs in the absence of a current physical injury. In Paz v. Brush Engineered Materials,

949 So.2d 1 (Miss. 2007) (en banc), the court held that current Mississippi law does not "recognize a claim for medical monitoring allowing a plaintiff to recover medical monitoring costs for mere exposure to a harmful substance without proof of current physical or emotional injury from that exposure." Id. at 5-6.

> The United States Supreme Court has examined the common law for the allowance of recovery for negligently caused exposure by a plaintiff who has yet to suffer from a disease. [Metro-North Commuter R.R. Co. v. ]Buckley, 521 U.S. [424,] 432 . . . [(1997)] (holding that an employee could not recover damages and medical monitoring costs under the Federal Employers' Liability Act unless or until he manifested symptoms of a disease). The Court found that with few exceptions, "common law courts have denied recovery to those who are disease and symptom free." Id. The Court concluded that to recognize medical monitoring costs alone as a separate injury is to go "beyond the bounds of currently evolving common law." Id. at 439 . . . . Accordingly, as plaintiffs invite this [Paz] Court to recognize a medical monitoring cause of action, an act which would require an unprecedented and unfounded departure from the long-standing traditional elements of a tort action, this Court declines that invitation.

Paz, 949 So.2d at 6 (footnote omitted).

> The possibility of a future injury is insufficient to maintain a tort claim. Recognizing a medical monitoring cause of action would be akin to recognizing a cause of action for fear of future illness. Each bases a claim for damages on the possibility of incurring an illness with no present manifest injury. There is no tort cause of action in Mississippi without some identifiable injury, either physical or emotional.

Id. at 5; see id. at 9 ("This Court has continuously rejected the proposition that within tort law there exists a cause of action or a general category of injury consisting solely of potential future injury.").

In Wood v. Wyeth-Ayerst Laboratories Division of American Home Products, 82 S.W.3d 849 (Ky. 2002) ("Wood"), the court stated that under Kentucky law "a cause of action in tort requires a present physical injury to the plaintiff," 82 S.W.3d at 852, and that "a plaintiff must have sustained some physical injury before a cause of action can accrue," id. at 853-54.

No cause of action accrues until the potentially harmful exposure actually causes injury that produces loss or damage. . . . With no injury there can be no cause of action, and with no cause of action there can be no recovery. It is not the remedy that supports the cause of action, but rather the cause of action that supports a remedy.

Id. at 855 (internal quotation marks omitted) (emphasis in Wood).

The court ruled that "mere ingestion of a toxic substance does not constitute sufficient physical harm upon which to base a claim for damages." Id. at 856 (internal quotation marks omitted).

Because Appellant has shown no present physical injury, her cause of action under theories of negligence and strict liability have yet to accrue. Thus, Appellant's complaint was correctly dismissed for failure to state a claim upon which relief can be granted. For the same reasons, the class action must fail. Where there is no injury, there can be no redress. If and when Appellant manifests an injury resulting from [the defendant's] conduct, only then will she have a remedy under the law.

Id. at 859.

In Henry v. Dow Chemical Co., 473 Mich. 63, 701 N.W.2d 684 (Mich. 2005), the court held that a claim merely for "an 'equitable remedy' of a medical monitoring program not in order to redress actual or present injury to their persons but instead to screen for possible future injury," id. at 78, 701 N.W.2d at 691, "do[es] not present a viable negligence claim under Michigan's common law," id. at 68, 701 N.W.2d at 687.

If plaintiffs' claim is for injuries they may suffer in the future, their claim is precluded as a matter of law, because Michigan law requires more than a merely speculative injury. This Court has previously recognized the requirement of a present physical injury in the toxic tort context.

Id. at 72, 701 N.W.2d at 688.

However, if plaintiffs' claim is that by virtue of their potential exposure to dioxin they have suffered an "injury," in that any person so exposed would incur the additional expense of medical monitoring, then their claim is also precluded as a matter of law, because Michigan law requires an actual injury

to person or property as a precondition to recovery under a negligence theory.

Id. at 73, 701 N.W.2d at 689.

It is no answer to argue, as plaintiffs have, that the need to pay for medical monitoring is itself a present injury sufficient to sustain a cause of action for negligence. In so doing, plaintiffs attempt to blur the distinction between "injury" and "damages." While plaintiffs arguably demonstrate economic losses that would otherwise satisfy the "damages" element of a traditional tort claim, the fact remains that these economic losses are wholly derivative of a possible, future injury rather than an actual, present injury. A financial "injury" is simply not a present physical injury, and thus not cognizable under our tort system. Because plaintiffs have not alleged a present physical injury, but rather, "bare" damages, the medical expenses plaintiffs claim to have suffered (and will suffer in the future) are not compensable.

Id. at 78, 701 N.W.2d at 691 (emphases in original).

Accord Hinton v. Monsanto Co., 813 So.2d 827, 828-29 (Ala. 2001) (A complaint asserting claims of negligence, wantonness, and strict products liability and alleging that "medical monitoring (or medical surveillance) . . . is necessary in order to detect injuries or illnesses that may arise in the future as a result of the exposure" to the toxic substance, but "not alleg[ing] any past or present personal injury to the plaintiff" does not state a cause of action for medical monitoring. "Alabama law has long required a manifest, present injury before a plaintiff may recover in tort."); Lowe v. Philip Morris USA, Inc., 344 Or. 403, 410, 183 P.3d 181, 184 (2008) ("Oregon law has long recognized that the fact that a defendant's negligence poses a threat of future physical harm is not sufficient, standing alone, to constitute an actionable injury"); id. at 415, 183 P.3d at 187 ("negligent conduct that results only in a significantly increased risk of future injury that requires medical monitoring does not give rise to a claim for negligence").

In Henry, the Michigan Supreme Court viewed the question of whether a cause of action should be recognized for medical monitoring in the absence of present physical injury as one

more suitable for resolution by the legislative branch.

> Plaintiffs have asked us to recognize a cause of action that departs drastically from our traditional notions of a valid negligence claim. Beyond this enormous shift in our tort jurisprudence, judicial recognition of plaintiffs' claim may also have undesirable effects that neither we nor the parties can satisfactorily predict. For example, recognizing a cause of action based solely on exposure--one without a requirement of a present injury--would create a potentially limitless pool of plaintiffs. . . . []Once a showing of present physical injury is eliminated, as is the case in awards for medical monitoring, attorneys representing plaintiffs could virtually begin recruiting people off the street to serve as medical monitoring claimants. . . . Litigation of these preinjury claims could drain resources needed to compensate those with manifest physical injuries and a more immediate need for medical care. It is less than obvious, therefore, that the benefits of a medical monitoring cause of action would outweigh the burdens imposed on plaintiffs with manifest injuries, our judicial system, and those responsible for administering and financing medical care. Because such a balancing process would necessarily require extensive fact-finding and the weighing of important, and sometimes conflicting, policy concerns, and because here we lack sufficient information to assess intelligently and fully the potential consequences of our decision, we do not believe that the instant question is one suitable for resolution by the judicial branch.

Id. at 83-84, 701 N.W.2d at 694-95 (emphasis in original) (footnote omitted); see id. at 84 n.13, 701 N.W.2d at 695 n.13 ("whether and how to recognize a medical monitoring cause of action should be made by the people's representatives in the legislative branch of our government").

In Badillo v. American Brands, Inc., 117 Nev. 34, 16 P.3d 435 (2001) (en banc), the plaintiffs and the proposed class members included groups of smokers and groups of "casino employees (both nonsmokers and former smokers) who claim exposure to environmental or secondhand tobacco smoke at work." Id. at 38, 16 P.3d at 438. After exploring the factual, scientific, and legal landscape, the court ruled that "Nevada common law does not recognize a medical monitoring cause of action but the remedy of medical monitoring may be available." Id., 16 P.3d at 437. The court reached this conclusion after taking into account, inter alia, "the complex fact

pattern of tobacco litigation and causality," the lack of a consensus in other jurisdictions as to "whether present physical injury is required for a medical monitoring claim," and the lack of uniformity as to "the elements of medical monitoring as a cause of action[, which vary] from one jurisdiction to another." Id. at 43-44, 16 P.3d at 441. The Badillo court did not consider whether medical monitoring costs could be recovered as an item of consequential damages because that question had not been briefed. See id. at 44, 16 P.3d at 441.

D. Elements of an Independent Medical Monitoring Cause of Action

Most of the courts that have concluded that a plaintiff who has not suffered physical injury from tortious exposure to hazardous substances may maintain a cause of action for medical monitoring have elaborated on the elements necessary to prevail on such a claim. The lists of elements are similar, but not identical. In Ayers, the court

> h[e]ld that the cost of medical surveillance is a compensable item of damages where the proofs demonstrate, through reliable expert testimony predicated upon the significance and extent of exposure to chemicals, the toxicity of the chemicals, the seriousness of the diseases for which individuals are at risk, the relative increase in the chance of onset of disease in those exposed, and the value of early diagnosis, that such surveillance to monitor the effect of exposure to toxic chemicals is reasonable and necessary.

106 N.J. at 606, 525 A.2d at 312. The court indicated that "the medical surveillance claim seeks reimbursement for the specific dollar costs of periodic examinations that are medically necessary notwithstanding the fact that the extent of plaintiffs' impaired health is unquantified." Id., 525 A.2d at 313.

The court in Potter set out a five-factor test for "determining the reasonableness and necessity of monitoring":

(1) the significance and extent of the plaintiff's exposure to chemicals; (2) the toxicity of the chemicals; (3) the relative increase in the chance of onset of disease in the exposed plaintiff as a result of the exposure, when compared to (a) the plaintiff's chances of developing the disease had he or she not been exposed, and (b) the chances of the members of the public at large of developing the disease; (4) the seriousness of the disease for which the plaintiff is at risk; and (5) the clinical value of early detection and diagnosis. Under this holding, it is for the trier of fact to decide, on the basis of competent medical testimony, whether and to what extent the particular plaintiff's exposure to toxic chemicals in a given situation justifies future periodic medical monitoring.

6 Cal.4th at 1009, 863 P.2d at 824-25.

In <u>Donovan</u>, the Massachusetts court stated that a plaintiff asserting a medical monitoring cause of action must show that

(1) [t]he defendant's negligence (2) caused (3) the plaintiff to become exposed to a hazardous substance that produced, at least, subcellular changes that substantially increased the risk of serious disease, illness, or injury (4) for which an effective medical test for reliable early detection exists, (5) and early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury, and (6) such diagnostic medical examinations are reasonably (and periodically) necessary, conformably with the standard of care, and (7) the present value of the reasonable cost of such tests and care, as of the date of the filing of the complaint.

455 Mass. at 226, 914 N.E.2d at 902.

The court in <u>Hansen</u> set out the following standard for Utah courts to follow in determining whether to award medical monitoring costs, a standard that includes the requirement-- somewhat like the fifth element described by <u>Donovan</u>--that there exist some effective treatment for the disease whose early detection is sought. The court stated that a plaintiff must prove

(1) exposure

(2) to a toxic substance,

(3) which exposure was caused by the defendant's negligence,

(4) resulting in an increased risk

(5) of a serious disease, illness, or injury

(6) for which a medical test for early detection exists

(7) and for which early detection is beneficial, meaning that a treatment exists that can alter the course of the illness,

(8) and which test has been prescribed by a qualified physician according to contemporary scientific principles.

858 P.2d at 979; see also id. at 979-80 (elaborating on each element). As to its sixth element, which--like the fourth element described by Donovan--requires proof of an available effective test, the Hansen court stated

the plaintiff must prove that a test exists for detecting the onset of the illness before it would be apparent to the layperson. If no such test exists, then periodic monitoring is pointless and no cause of action for monitoring exists.FN12 In such a situation, the potential plaintiff is not harmed until the onset of the actual illness. At that time, he or she can bring an action for actual injury.FN13

FN12. Of course, if a test is later developed that will detect the disease, a plaintiff would retain the right to demonstrate at some later date the effectiveness of the test and be compensated for utilizing it, if all other elements of the cause of action are present.

FN13. The statute of limitations certainly will not run on a cause of action when a critical element of that cause, actual injury, has yet to evidence itself.

979 & nn.12 and 13.

In Redland, the court stated that in order to prevail on a common law claim for medical monitoring, a plaintiff must prove the following:

(1) exposure greater than normal background levels;

(2) to a proven hazardous substance;

(3) caused by the defendant's negligence;

(4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease;

(5) a monitoring procedure exists that makes the early detection of the disease possible;

(6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and

(7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

548 Pa. at 195-96, 696 A.2d at 145-46. See also Abbatiello, 522 F.Supp.2d at 538-39 (predicting that the New York Court of Appeals would adopt the elements set out in Redland).

As to Redland's sixth element, i.e., the need for differentiation between the proposed medical monitoring and other medical monitoring, the Pennsylvania court stated that if courts imposed medical monitoring liability without requiring a showing that exposed plaintiffs require a different monitoring regime than unexposed persons, polluters would become "health care insurer[s]." 548 Pa. at 193, 696 A.2d at 144 (internal quotation marks omitted). The Redland court also noted that, unlike Utah law as described by the Hansen court, Pennsylvania law does not require that a plaintiff prove that an effective "treatment" be available. Id. at 196 n.8, 696 A.2d at 146 n.8.

All of the above states that recognized a medical monitoring cause of action noted that such a claim cannot be established without reliable expert testimony. See, e.g., Ayers, 106 N.J. at 606, 525 A.2d at 312 (requiring "reliable expert testimony predicated upon the significance and extent of exposure to chemicals, the toxicity of the chemicals, the seriousness of the diseases for which

individuals are at risk, the relative increase in the chance of onset of disease in those exposed, and the value of early diagnosis, that such surveillance to monitor the effect of exposure to toxic chemicals is reasonable and necessary"); Donovan, 455 Mass. at 227, 914 N.E.2d at 902; Hansen, 858 P.2d at 980; Redland, 548 Pa. at 196, 696 A.2d at 146; Potter, 6 Cal.4th at 1009, 863 P.2d at 824.

Some of the cases have also indicated that a medical monitoring cause of action may be subject to normal tort defenses such as assumption of risk and contributory negligence. See Donovan, 455 Mass. at 226 n.11, 914 N.E.2d at 901 n.11 ("[a] plaintiff[ smoker]'s claim would, of course, remain subject to all available affirmative defenses, such as contributory negligence"); Potter, 6 Cal.4th at 974, 863 P.2d at 801 ("when a defendant in a [toxic landfill] negligence action demonstrates that a plaintiff's smoking is negligent and that a portion of the plaintiff's fear of cancer is attributable to the smoking, comparative fault principles may be applied to reduce the amount of recovery for emotional distress damages based on such fear"). See also Dangler, 241 A.D.2d at 294, 672 N.Y.S.2d at 191 (in a cancerphobia case involving a toxic landfill, a jury may properly consider the plaintiffs' "voluntary exposure to carcinogens, for example, by smoking").

E. Certification of Questions to the New York Court of Appeals

In cases such as this one, in which state law controls and the governing principles are uncertain or ambiguous, we attempt to predict how the highest court of the state would resolve the uncertainty or ambiguity. See, e.g., Travelers Insurance Co. v. 633 Third Associates, 14 F.3d 114, 119 (2d Cir. 1994). In so doing, we give full weight to the decisions of the state's highest court, and we give due regard to the decisions of the state's lower courts. See, e.g., Phansalkar v. Andersen Weinroth & Co., 344 F.3d 184, 199 (2d Cir. 2003); Michalski v. Home Depot, Inc., 225 F.3d 113, 116

(2d Cir. 2000). We also remain "free to consider all of the resources to which the highest court of the state could look, including decisions in other jurisdictions on the same or analogous issues," Leon's Bakery, Inc. v. Grinnell Corp., 990 F.2d 44, 48 (2d Cir. 1993).

As the discussion in Parts III.A., B., C., and D. above indicates, where the plaintiffs have alleged tortious exposure to toxic substances but have not alleged that they suffered physical injury, the New York intermediate appellate courts have ruled that the cost of medical monitoring may be awarded as an item of consequential damages, most of the federal district courts sitting in New York have opined that New York would recognize an independent claim for medical monitoring, and the highest courts of other states have divided as to whether or not the plaintiff may maintain an independent medical monitoring cause of action.

None of the New York courts has directly addressed the question of whether the State recognizes an independent cause of action for medical monitoring, and the answer to this question, which has the capacity to resolve this litigation, is unclear. The question is material in the present action because the statute of limitations bars plaintiffs' pursuit of their traditional claims for negligence and strict products liability; the principle evinced in cases such as Askey, Allen, and Abusio, that the cost of medical monitoring may be recovered as an element of consequential damages, would be immaterial to claims that are time-barred.

If, however, New York recognizes an independent cause of action for medical monitoring, and if, as recognized, that claim is viewed as accruing when an effective monitoring test becomes available--and if plaintiffs' allegations as to the availability and effectiveness of LDCT and as to the lack of effectiveness of prior tests are proven--the statute of limitations likely will not have run on that independent cause of action. We also note our uncertainty as to how New York would

regard claim accrual in the event of further technological advances that may from time to time improve on the effectiveness of existing tests. We frame the certified questions as we have in order to facilitate the weighing of competing policy considerations, including various gradations of health concerns and the potential for preventive or early-detection measures, in light of the scope of plaintiffs' claims on behalf of a putative class of persons who not only have not been diagnosed with a smoking-related disease but also are not under investigation by a physician for such a suspected disease.

This Court's Local Rule 27.2 allows certification of such questions "where the New York Court of Appeals has not spoken clearly on an issue and we are unable to predict, based on other decisions by New York courts, how the Court of Appeals would answer a certain question." Giordano v. Market America, Inc., 599 F.3d 87, 100 (2d Cir. 2010). Certification is particularly desirable where a "decision reflects value judgments and important public policy choices that the New York Court of Appeals is better situated than we are to make," id. at 101; see, e.g., Hall v. United Parcel Service, Inc., 76 N.Y.2d 27, 33, 556 N.Y.S.2d 21, 25 (1990) ("Whether we should . . . recogniz[e] a remedy in tort is a question that is best resolved by reference to the relevant judicial and social policy considerations."). The Local Rules of the New York Court of Appeals permit certification of questions by this Court when we encounter "determinative questions of New York law . . . for which no controlling precedent of the Court of Appeals exists." N.Y. Court of Appeals Local Rule 500.27(a).

In light of (a) the lack of controlling precedent of the New York Court of Appeals, (b) the absence of clear guidance by New York's intermediate appellate courts, (c) the importance of the questions presented as to the availability of medical monitoring as an independent cause of action, and (d) the value judgments and important policy considerations that must be balanced in resolving these

questions, we conclude that the New York Court of Appeals is better suited than this Court to determine whether New York recognizes such a cause of action. Accordingly, we certify the following questions of New York law:

> (1) Under New York law, may a current or former longtime heavy smoker who has not been diagnosed with a smoking-related disease, and who is not under investigation by a physician for such a suspected disease, pursue an independent equitable cause of action for medical monitoring for such a disease?

> (2) If New York recognizes such an independent cause of action for medical monitoring,

>> (A) What are the elements of that cause of action?

>> (B) What is the applicable statute of limitations, and when does that cause of action accrue?

We do not intend this articulation of the above specified questions to limit the scope of the analysis by the Court of Appeals, and we invite the Court of Appeals to expand upon or alter these questions as it deems appropriate.

CONCLUSION

We have considered all of the plaintiffs' remaining arguments on appeal and have found them to be without merit. Accordingly, we affirm the judgment of the district court to the extent that it dismissed plaintiffs' claims of negligence, strict liability, and breach of the implied warranty of merchantability.

With respect to the plaintiffs' independent claim seeking medical monitoring, we hereby instruct the Clerk of Court for the Second Circuit to transmit to the Clerk of the New York Court of Appeals this opinion as our certificate, together with a complete set of all filings in this Court by the parties. This panel will retain jurisdiction of the present appeal for resolution after disposition of the certified questions by the New York Court of Appeals.